UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
MORGAN STANLEY CAPITAL GROUP, INC.,     :
                         Plaintiff,     :
                                        :    09 Civ. 1073 (DLC)
             -v-                        :
                                        :    OPINION & ORDER
TRAFIGURA AG,                           :
                         Defendant.     :
                                        :
----------------------------------------X

Appearances:

For plaintiff:

Melvin A. Brosterman
Quinn D. Murphy
Derek I.A. Silverman
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038

For defendant:

Gregory James Krock
Corrado Salvatore
Buchanan Ingersoll & Rooney PC
One Oxford Centre
301 Grant Street, 20th Floor
Pittsburgh, PA 15219


DENISE COTE, District Judge:

     This Opinion addresses a phenomenon known as a "book

transfer chain" in the market for petroleum products, and the

effort of one party to "break" the "book" on its effective date.

In July 2008, plaintiff Morgan Stanley Capital Group, Inc.

("MSCG") agreed to purchase 25,000 barrels of M2 grade gasoline

from defendant Trafigura AG ("Trafigura") to be delivered via the Colonial Pipeline either by physical delivery or "book transfer."  MSCG contends that after the parties' agreed-upon book transfer was cancelled, Trafigura breached its contractual obligation to physically deliver the gasoline to MSCG.  MSCG seeks recovery of $3,362,625 that it accidentally paid to Trafigura pursuant to the contract, as well as interest, attorneys' fees and costs.

A bench trial was held June 7-9, 2010.  This Opinion presents the Court's findings of fact and concludes that Trafigura did not breach its contract with MSCG because the parties did not agree to cancel the book transfer and Trafigura had no contractual obligation to physically deliver the gasoline to MSCG.


PROCEDURAL HISTORY

On February 6, 2009, MSCG filed this action against Trafigura, asserting a single claim for breach of contract.  The bench trial, held June 7-9, 2010, was conducted, without objection, in accordance with this Court's customary practices for the conduct of non-jury proceedings.  On May 28, 2010, the parties submitted a Joint Pretrial Order and proposed findings of fact and conclusions of law.  The parties also served affidavits containing the direct testimony of their witnesses

and copies of all the exhibits and deposition testimony that they intended to offer as evidence in their case in chief at trial.[1]

MSCG presented affidavits constituting the direct testimony of Kenneth Vincent ("Vincent"), a scheduler in the Denver, Colorado office of TransMontaigne, Inc. ("TransMontaigne"); Bryon Beckwith ("Beckwith"), the Director of Supply and Distribution in the Denver, Colorado office of TransMontaigne; David Hogan ("Hogan"), the New York Scheduling Manager in the Purchase, New York office of MSCG; Kevin Jandora ("Jandora"), the global head of Physical Oil Operations and the North American head of Power and Natural Gas Operations within Commodities Operations for MSCG; Chee Ooi ("Ooi"), the Executive Vice President for Supply and Trading at TransMontaigne; Christopher Arp ("Arp"), a manager in MSCG's Fixed Income Group; and Keith Grzeczka ("Grzeczka"), an Executive Director at JPMorgan Chase & Co., whom MSCG offered as an expert witness. Each of these witnesses appeared at trial and was available for cross examination.

---

[1] With its pretrial submissions, Trafigura filed a motion in limine to exclude evidence of MSCG's attorneys' fees and costs. Trafigura argues that the contract at issue does not provide for reimbursement of MSCG's attorneys' fees. At a final pretrial conference held on June 2, the Court advised the parties that it would reserve ruling on Trafigura's motion until after the merits of the breach of contract claim had been decided.

Trafigura presented affidavits constituting the direct testimony of Danielle Neely ("Neely"), a scheduler in Trafigura's Houston, Texas office; Matthew Coté ("Coté")[2], a scheduler in Trafigura's Houston, Texas office; Jason Liddell ("Liddell"), the Manager of Gasoline Trading for Trafigura; Mary Ellen Yacura ("Yacura"), the former head of finance in North America for Trafigura; and David Ownby ("Ownby"), a Director in the petroleum and chemical industry services practice of LECG, LLC, whom Trafigura offered as an expert witness.  Each of these witnesses appeared at trial and was available for cross-examination.

Excerpts from the depositions of testifying witnesses, as well as the following individuals, were offered and received into evidence at trial.  The parties offered excerpts from the depositions of Kellen Burdic ("Burdic"), a scheduler in the Denver, Colorado office of TransMontaigne; William Davidson ("Davidson"), a scheduler in the Stamford, Connecticut office of Glencore Ltd. ("Glencore"); Bruce Morgan ("Morgan"), the head of the petroleum trading and scheduling group at QuikTrip Corp. ("QuikTrip"); Dawn Tyler ("Tyler"), a former treasury analyst at Trafigura; and Cynthia Sawyer ("Sawyer"), a scheduler in the Houston, Texas office of SemFuel, L.P. ("SemFuel").

---

[2] Matthew Coté and the judge to whom this case is assigned are not related.

At the close of MSCG's case in chief, Trafigura moved for a directed verdict.  Trafigura also moved for judgment as a matter of law after the close of its case in chief.  Prior to summations, the court heard argument from the parties on Trafigura's motions and reserved decision.

<u>FINDINGS OF FACT</u>

This action arises from a contractual dispute between two sophisticated traders in the market for petroleum products. Plaintiff MSCG is the commodities division of Morgan Stanley, a global financial services company.  Among other activities, MSCG trades in the spot, forward, and futures markets in several commodities, including metals, crude oil, oil products, natural gas and electrical power.  TransMontaigne, an indirect, wholly-owned subsidiary of MSCG, is a distributor of unbranded refined petroleum products to independent wholesalers and industrial and commercial end users.  Defendant Trafigura is a commodities trading company headquartered in Switzerland.  In particular, Trafigura is involved in the trading of crude oil, petroleum products, renewable energies, metals, metal ores, and concentrates for industrial consumers.  Trafigura is the world's third-largest independent oil trader and the second largest independent trader in the non-ferrous concentrates market.

1.   Trading in Petroleum Products on the Colonial Pipeline

The Colonial Pipeline Company ("Colonial") is an interstate common carrier of petroleum products, delivering a daily average of 100 million gallons of gasoline and other fuels to shipper terminals in twelve states and the District of Columbia through a vast underground network of pipelines (the "Colonial Pipeline").  Colonial pumps petroleum products on the Colonial Pipeline in five-day periods, known as "cycles," which occur six times per month and approximately 72 times per year.  Because a cycle lasts five calendar days, it is possible to arrange for petroleum products to be "lifted" into the pipeline for up to four calendar days after the first day of the cycle.

In order to ship petroleum products on the Colonial Pipeline, a company, through its "scheduler," must enter a "nomination" in Colonial's computer system.[3]  A nomination is essentially a request for space to ship a petroleum product from an origin location to a destination location via the Colonial Pipeline.  To set up a nomination in Colonial's computer system, a purchaser provides its seller with a "batch," which consists of a series of characters identifying the purchaser and the

_____

[3] A scheduler is responsible for coordinating and executing a company's various contracts to purchase or sell gasoline on the Colonial Pipeline.  In other words, a scheduler is responsible for scheduling the performance of the contract.  Traders, not schedulers, are responsible for negotiating the terms of the contracts, such as price, grade, and quantity.

product to be shipped.  The seller must then provide the purchaser with an "origin," which identifies the ultimate shipper of the product.  The batch and origin are then "nominated," i.e., transmitted, to Colonial, which uses this information to credit the account of the purchaser with the petroleum product shipped on the Colonial Pipeline.

Colonial designates a "scheduling day" for each cycle, which represents the final date that a batch and origin can be nominated and confirmed to Colonial to arrange for physical delivery of petroleum products on the Colonial Pipeline. Colonial typically targets scheduling day to be four days prior to the lifting of the cycle out of Pasadena, Texas, the southernmost origin on the Colonial Pipeline.  On or before scheduling day, schedulers from companies with contracts to buy or sell petroleum products on the Colonial Pipeline contact each other, typically via an instant messenger service, such as Yahoo! Messenger, in order to schedule the settlement of the contracts entered into by the companies' traders.  Schedulers also attempt to determine if they are able to create what is known in the industry as a "book transfer chain."[4]

A book transfer chain involves a series of buy and sell obligations between multiple companies, such that the buy and

---

[4] A book transfer chain is also sometimes referred to in the industry as simply a "book" or a "book-out."

sell obligations form a circle whereby each company in the chain
will be buying and selling the same amount of a particular
petroleum product on the cycle.  When only two parties are
involved, they may "net out" their respective contracts through
a book-out.  The purpose of a book transfer chain is the
efficient settlement of trades.  Instead of transferring the
physical product from each seller to each purchaser, and the
purchaser paying for the product after the product is received
(only to turn around and sell the product to its purchaser),
schedulers endeavor to settle each contract through wire
transfers of the purchase price on a chosen day, called the
"effective date," from a party with an obligation to purchase
gasoline to that party's respective seller of gasoline.

    The effective date of a book transfer is typically the
first day that product is lifted into the Colonial Pipeline for
a particular cycle, but can be any day of the cycle if agreed
upon by the parties.  If the parties agree to settle their buy
and sell obligations through a book transfer chain, Colonial is
not provided a batch and origin on scheduling day.  In fact, the
parties do not even advise Colonial of the existence of the book
transfer chain.  Instead, title to the gasoline is simply deemed
to transfer through the chain as of 12:01 AM on the effective
date.  Unless alternative arrangements are made, each party pays
its counterparty via wire transfer at some point on the

effective date.  Thus, the book transfer chain ultimately has
the same economic effect as the physical delivery of the
petroleum product.

Contracts for the purchase and sale of gasoline on the
Colonial Pipeline typically contain a provision that permits a
seller to demand that the buyer post security for the payment it
is obligated to make on the effective date.  Security may, for
example, take the form of prepayment of all or a portion of the
purchase price or an irrevocable standby letter of credit.  If
such security is demanded by the seller on or after scheduling
day, it is typically posted by the purchaser no later than two
business days prior to the effective date of the book transfer.
If no special arrangements for payment have been made, payment
for physically-delivered gasoline is typically due two days
after the purchaser's receipt of the seller's invoice and a
pipeline meter ticket evidencing delivery of the gasoline.

Book transfers play an important role in the market for
petroleum products because they increase liquidity in that
market and provide additional hedging opportunities for market
participants.  Book transfers are particularly important for
traders, like Trafigura, who do not own refineries or extensive
facilities to store gasoline.  For example, even though
Trafigura enters into many contracts to purchase and sell
gasoline on the Colonial Pipeline, it rarely intends to pump any

barrels into, or remove any barrels from, the pipeline.  In
fact, approximately 90 percent of Trafigura's transactions
involving Colonial Pipeline gasoline are scheduled to be
performed by book transfer.  Accordingly, on scheduling day,
traders and schedulers at Trafigura coordinate to make sure that
Trafigura is "flat," which means that Trafigura has contracted
to purchase and sell the same quantity of gasoline during that
cycle.

2.   July 8, 2008:  The Contract

On July 8, 2008, MSCG entered into a contract with
Trafigura to purchase 25,000 barrels of M2 grade gasoline on
cycle 41 of the Colonial Pipeline, at a price of $3.2025 per
gallon, for a total contract price of $3,362,625 (the
"Contract").  Pursuant to the Contract's "Delivery Terms and
Conditions" clause, MSCG and Trafigura agreed that Trafigura
would deliver the gasoline "FOB Pasadena, Texas into the
Colonial Pipeline via mutually agreeable scheduling during July
2008, on cycle 41, or via mutually acceptable book, stock or
inventory transfer against designated barrels of Seller or
originator."  (Emphasis added.)

The Contract provides that title to the gasoline "[w]ill
pass from Seller [Trafigura] to Buyer [MSCG] at origin as the
Products pass the delivery point on the [C]olonial [P]ipeline or

<u>at the time of book, stock or inventory transfer</u>." (Emphasis added.) MSCG agreed to make payment either (1) within two New York banking days after receipt of Trafigura's invoice and a pipeline meter ticket evidencing the net quantity of gasoline delivered, or (2) if delivery was made by book transfer, "by wire transfer of federal funds <u>on effective date of book transfer</u>." (Emphasis added.)

In a paragraph entitled "Operational/Financial Contacts," the parties agreed that MSCG would make any operational notifications to Trafigura by contacting Neely, Trafigura's scheduler, at her office telephone, facsimile, or e-mail address. The contract also provides:

> All notices and confirmations from Buyer to Seller arising out of or in connection with this contract must be received by Seller <u>within office hours (0830 to 1730)</u> in the relevant time zone and sent in accordance with the notice provisions herein. Any notice or communication addressed to someone other than the Seller(s) representatives named herein shall be deemed to have not been received and shall have no legal or contractual force or effect. <u>Any notices received outside of office hours (as described above) shall be deemed to have been received on the next working day.</u>

(Emphasis added.)

The Contract contains an integration clause that states in pertinent part: "This confirmation constitutes the contract between the parties and supersedes all prior communications between the parties."

3.   July 8-15, 2008:  Other Relevant Contracts

In addition to the Contract, four other relevant agreements were entered into between July 8 and July 15 for the delivery of at least 25,000 barrels of M2 grade gasoline on cycle 41 of the Colonial Pipeline.  The day after MSCG entered into the Contract to purchase gasoline from Trafigura, it entered into a contract to sell gasoline to SemFuel.  On July 9, MSCG agreed to sell 50,000 barrels of M2 gasoline on cycle 41 to SemFuel at $3.2780 per gallon, for a total contract price of $6,883,800.  The contract between MSCG and SemFuel provided that MSCG could, in its sole discretion, require SemFuel to provide MSCG with credit support, such as prepayment or an irrevocable letter of credit, with respect to SemFuel's ability to perform under the contract. MSCG did not, however, require SemFuel to post any security when it entered into the contract.

Having entered into the Contract to sell gasoline to MSCG, one week later on July 15, Trafigura entered into a contract with Glencore to purchase 25,000 barrels of M2 grade gasoline at $3.24 per gallon on cycle 41, for a total contract price of $3,402,000.  The contract required Trafigura to post an irrevocable standby letter of credit in favor of Glencore as security for payment prior to delivery or book transfer.

Two other relevant contracts for the purchase of M2 grade gasoline on cycle 41 were agreed to as follows: (1) on July 8,

Glencore entered into a contract to purchase 75,000 barrels from QuikTrip; and (2) on July 15, QuikTrip entered into a contract to purchase 25,000 barrels from SemFuel at $3.1910 per gallon for a total contract price of $3,350,550.

4.   July 15, 2008:  Scheduling Day

Colonial designated Tuesday, July 15, as the scheduling day for cycle 41 ("Scheduling Day").  At 11:16 AM CST (10:16 AM MST)[5], Donna Deffenbaugh ("Deffenbaugh"), a QuikTrip scheduler located in Tulsa, Oklahoma, sent an instant message ("IM") to Sawyer, a SemFuel scheduler in Houston, proposing a book transfer chain involving 25,000 barrels of M2 grade gasoline between SemFuel, QuikTrip, Glencore, Trafigura, and MSCG with an effective date of July 21 (the "Effective Date").[6]  July 21 fell on the following Monday and was the first day that the gasoline would lift into the Colonial Pipeline at Pasadena, Texas for cycle 41.  At 11:17 AM CST (10:17 AM MST), Sawyer replied "good with me thanks chking with msc," meaning that the proposed book

---

[5] The times in this Opinion are provided in Central Standard Time ("CST"), the time zone for Houston, Texas, where Trafigura's schedulers were located, and Mountain Standard Time ("MST"), the time zone for Denver, Colorado, where MSCG's schedulers were located.

[6] Deffenbaugh's IM was written in shorthand typically used by schedulers when communicating with each other via instant messaging.  Thus, the exact text of Deffenbaugh's IM states: "how about 25mb srp-qtc-glc-tra-msc-srp 7/21?"

transfer was acceptable to SemFuel, but that Sawyer would have to confirm with MSCG, SemFuel's other counterparty, to see whether the proposed chain was acceptable to MSCG.

Deffenbaugh also sent an IM to Davidson, a Glencore scheduler in Stamford, Connecticut, proposing the same book transfer.  Although Glencore had agreed to purchase a total of 75,000 barrels from QuikTrip, the proposed book transfer chain would involve only 25,000 of these barrels.  Davidson sent an IM to Neely, a scheduler at Trafigura in Houston, Texas, and proposed the book transfer chain to her.  Neely immediately responded:  "good with me."  Neely, in turn, sent an IM to Vincent, a TransMontaigne scheduler in Denver, Colorado, to see whether MSCG would agree to the proposed book transfer chain. At 11:15 AM CST (10:15 AM MST), Vincent replied "agreed."  Neely then confirmed to Davidson at Glencore that MSCG had agreed to the proposed book transfer chain.  Similarly, Sawyer informed Vincent, either through IM or by telephone, that SemFuel had agreed to the proposed book transfer chain.  Neither party disputes that through these IM exchanges, they agreed on July 15 that Trafigura would "deliver" the gasoline via this "mutually acceptable" book transfer chain.

Thus, on Scheduling Day, each of the purchasers agreed to pay the purchase price to each of the sellers due under their respective contracts on the Effective Date, and that title to

the gasoline would pass to the buyers at 12:01 AM on the
Effective Date.  The diagram below displays the purchasers and
sellers under each contract and the resulting movement of funds
and transfer of title in the book transfer chain at issue here
(the "Book Transfer Chain"):



After the Book Transfer Chain was established on Scheduling
Day, each seller sent an invoice to its purchaser for the amount
due under their respective contracts on the Effective Date.
Thus, on July 16, MSCG sent an invoice to SemFuel to wire
$3,441,900 to MSCG on July 21.  On July 17, Trafigura sent an

invoice to MSCG to wire $3,362,625 to Trafigura on July 21.
Because this Book Transfer Chain had been established, no party
in the chain nominated a batch and origin to Colonial for this
gasoline on Scheduling Day for cycle 41.

5.   July 18, 2008:  MSCG Seeks to Reschedule the Effective Date
     At some point during the week of July 14, MSCG became aware
that SemFuel and its parent company, SemGroup, L.P.
("SemGroup"), were experiencing significant financial
difficulties.  As already noted, MSCG's contract with SemFuel
permitted it to demand security from SemFuel, but MSCG had not
done so, presumably because MSCG had extended SemFuel a $10
million line of credit that was sufficient to cover the payment
SemFuel would be required to make on the Effective Date.  Then,
on Thursday, July 17, Moody's Investors Service downgraded
SemGroup and its stock price dropped.  As a result of this
credit downgrade, MSCG rescinded the $10 million line of credit
that it had extended to SemFuel.
     On the morning of Friday, July 18, Vincent, the MSCG
scheduler, contacted Sawyer, the SemFuel scheduler, and demanded
that SemFuel post security in the form of a prepayment or an
irrevocable letter of credit by the close of business on July
18.  Vincent left the TransMontaigne office in Denver at 3:00 PM
MST (4:00 PM CST / 5:00 PM EST) without knowing whether SemFuel

would comply with MSCG's demand.  As it turned out, SemFuel did
not post security by 5:00 PM EST.

On the evening of July 18, concerned that SemFuel might not
make its payment on July 21, MSCG sought to reschedule the
Effective Date.  MSCG did not, however, discuss canceling the
book transfer between MSCG and Trafigura or having the parties
satisfy their obligations by physical delivery.  Because Vincent
had left the office, Beckwith, the Director of Supply and
Distribution at TransMontaigne, instructed Burdic, Vincent's
back-up scheduler, to relay a message to Trafigura that MSCG
wished to reschedule the Effective Date.  At 4:55 PM CST (3:55
PM MST), not seeing Neely online, Burdic sent an IM to Coté,
Neely's back-up scheduler in Houston.  Burdic's IM stated that
"[MSCG] need[ed] to push back the agreed settlement date" of the
book transfer.  Coté responded that he did not "handle
[gasolines]" and so was "passing [Burdic's message] to [Neely]."

Burdic located a cell phone number for Neely, who had
already left the Trafigura office in Houston, and placed a call
to her sometime around 5:20 PM CST (4:20 PM MST).  Neely was at
a bar with friends.  As Burdic remembers, he informed Neely that
MSCG was "putting the book on hold until the following Monday
morning" and that MSCG "would contact her Monday morning about
rescheduling."  At his deposition, Burdic testified that he
understood this message to mean that MSCG and Trafigura were

"going to discuss the details of [the book transfer] later."
According to Burdic, Neely simply replied:  "Okay."  Neely
testified that she interpreted Burdic's call to be a request to
reschedule the Effective Date of the book transfer.  Burdic and
Neely did not discuss canceling the book transfer or the
possibility that Trafigura would physically deliver the gasoline
to MSCG.  Burdic did not tell Neely what date MSCG would be
proposing on Monday as the new effective date for the book
transfer.

While Burdic was calling Neely, Beckwith called Sawyer, the
SemFuel scheduler, on her cell phone.  Like Neely, Sawyer had
already left the office for the day.  Beckwith remembers
advising Sawyer that MSCG "would need to hold off on the book
transfer and that on Monday [MSCG] would reschedule it."  After
internal discussions with his supervisors at MSCG, Beckwith then
sent an e-mail to Neely and Sawyer at 5:54 PM CST (4:54 PM MST)
(the "Beckwith E-mail") stating:

> [MSCG] is in a book transfer sequence for 25mb [25,000
> barrels] of C[ycle] 41 M2 [grade gasoline], effective
> [July 21, 2008].  The sequence is: Morgan/SemGroup/
> QuikTrip/Trafigura/Morgan.
>
> At this time, Morgan <u>can not agree with the effective
> date</u> of this transfer.  We will contact you, Monday
> morning, [July 21], to <u>reschedule</u> this transaction.

(Emphasis added.)[7]  The Beckwith E-mail contained an error in its description of the Book Transfer Chain:  it inadvertently omitted Trafigura's counterparty, Glencore.  The Beckwith E-mail made no mention of canceling the book transfer or converting it to physical delivery of gasoline.  Nor did the e-mail propose a new effective date for the book transfer.

On Friday evening, Beckwith urged that MSCG send the e-mail to every member of the Book Transfer Chain, but he was overruled by Kenneth Carlino, a Vice President at MSCG in New York.  As a result, on Friday evening, MSCG notified only its contractual counterparties, Trafigura and SemFuel, of its request to reschedule the Effective Date.  Although Neely received the Beckwith E-mail on Friday evening, she did not forward it to anyone at Glencore, Trafigura's other contractual counterparty, to notify Glencore of MSCG's request.  Sawyer, who had already left the office, did not receive the Beckwith E-mail on Friday evening, and therefore did not forward it to anyone at QuikTrip to notify it of MSCG's request.  Thus, as of Friday evening, the last business day prior to the Effective Date, neither Glencore nor QuikTrip had any notice that MSCG wished to reschedule the Effective Date of the Book Transfer Chain.

---

[7] An earlier draft of the Beckwith E-mail included the following line:  "Please be aware that [MSCG] is committed to fulfilling its obligation and will do so on Monday."  (Emphasis added).  Beckwith's supervisors at MSCG instructed him to remove this line before he sent the e-mail to Trafigura and SemFuel.

MSCG took one additional step on Friday evening.  Its operations department was instructed to place a hold on the payment to Trafigura.  Meanwhile, Neely forwarded the Beckwith E-mail to Trafigura's traffic and treasury groups who had responsibilities for paying invoices.  Neely asked that the groups hold payment on the book transfer identified in the Beckwith E-mail.  Although the Beckwith E-mail mistakenly omitted Glencore from the Book Transfer Chain, Trafigura's treasury group was able to identify Glencore as Trafigura's counterparty and placed a hold on the payment to Glencore.[8]

6.   July 21, 2008:  The Effective Date of the Book Transfer

There were no relevant communications regarding the Book Transfer Chain over the weekend of July 21 and 22.  Unless the Contract had been amended or cancelled, title to the gasoline was deemed to have transferred from Trafigura to MSCG at 12:01 AM on the morning of July 21.

As of 9:00 AM CST (8:00 AM MST) on July 21, SemFuel had not posted security to MSCG.  While MSCG still desired to settle its contract with SemFuel via book transfer on July 21, Beckwith testified that others at MSCG "were working behind the scenes to change the book transfer date."

---

[8] MSCG's assertion that Neely identified Glencore as Trafigura's other counterparty on Friday evening is not borne out by her deposition when considered in its entirety.

It is undisputed that once the Book Transfer Chain was formed, the agreement of all members of the chain was required to reschedule the Effective Date.  Thus, on the morning of July 21, Vincent, the MSCG scheduler, contacted each of the parties in the Book Transfer Chain seeking to push back its Effective Date by three days to July 24.  At 9:55 AM CST (8:55 AM MST), Vincent sent an IM to Davidson, the Glencore scheduler, stating: "we need to change the due date for the [Book Transfer Chain] to [July 24]."  At 9:56 AM CST (8:56 AM MST), Vincent sent an IM to Neely at Trafigura, similarly stating:  "we need to change the due date for the [Book Transfer Chain] to July 24.  you cool with that?"  Neely replied: "yes that's fine with me, thx."  At 10:01 AM CST (9:01 AM MST), Neely sent an IM to Davidson to pass along MSCG's request.  Davidson, who had already been apprised of MSCG's request by Vincent, told Neely:  "I know.  I'll confirm in a few."

At 10:02 AM CST (9:02 AM MST), Vincent sent an IM to Deffenbaugh, the QuikTrip scheduler, stating in part:  "we need to change the due date for the [Book Transfer Chain] to [July 24].  you okay with that?"  Vincent's IM was the first notice that QuikTrip received of MSCG's desire to reschedule the Effective Date.  Deffenbaugh replied:  "hmm . . . can I ask why we need to push back 3 days?"  Vincent explained that it was "because of [SemFuel] not paying."  Deffenbaugh told Vincent

21

that she would have to "run this by first," meaning that she
would have to get approval from her supervisors.  Less than ten
minutes later, at 10:11 AM CST (9:11 AM MST), Deffenbaugh sent
an IM to Vincent stating:  "I cannot agree to change this book
date . . . will need to remain [July 21]."  Vincent replied:
"no kidding?"  Deffenbaugh stated:  "I am not . . . I must
remain at [July 21]."

     Sawyer, the SemFuel scheduler, sent an IM to Deffenbaugh
around 11:20 CST (10:20 MST) inquiring whether QuikTrip would
consent to MSCG's proposed new effective date.  As she had told
Vincent earlier, Deffenbaugh responded to Sawyer:  "No, I am not
in agreement with changing the date.  Will remain [July 21]."
Sawyer replied:  "Okay."  When asked at his deposition why
QuikTrip refused MSCG's request to reschedule the Effective Date
to July 24, Morgan, to whom Deffenbaugh reported at QuikTrip,
explained that at the time of MSCG's request, the "[b]ook was
done" and that "title [was] deemed to have transferred at
essentially midnight or 12:01 on the effective date."

     QuikTrip's refusal to reschedule the Effective Date of the
Book Transfer Chain came as an unwelcome surprise to Vincent and
his colleagues at MSCG.  Even after MSCG learned that QuikTrip
refused to reschedule the Effective Date, however, "there was
still some hope that SemFuel would get its money up to [MSCG]"
and the Book Transfer Chain would proceed on July 21.  Others at

MSCG were less optimistic.  Supervisors and executives at MSCG huddled for hours to devise a strategy to respond to this, in their experience, novel turn of events.  They feared that SemFuel would not pay MSCG for the gasoline that MSCG was deemed to have delivered to SemFuel through the Book Transfer Chain, and once QuikTrip sent its payment to SemFuel, the remaining parties to the Book Transfer Chain would be compelled to make their payments:  Glencore to QuikTrip and Trafigura to Glencore.  This would leave MSCG owing its payment to Trafigura without having received payment from SemFuel.

Meanwhile, as MSCG's leaders huddled, it appears that QuikTrip wired its payment of $2,874,480 to SemFuel.  At 12:41 PM CST (11:41 AM MST), Glencore, who was protected by the letter of credit posted by Trafigura, wired its payment of $3,349,500 to QuikTrip.  And, as significantly, MSCG's operations department wired its payment of $3,362,625 to Trafigura, despite the hold that had been placed on the payment the previous Friday evening.  Neither MSCG nor Trafigura was aware at the time that MSCG had paid Trafigura.  Trafigura did not wire its payment to Glencore, nor, as MSCG had feared, did SemFuel wire its payment to MSCG.  At some point on July 22, without Trafigura's knowledge, Glencore drew down on the irrevocable letter of credit that Trafigura had posted as security.

By approximately 2:00 PM CST (1:00 PM MST) on July 21, approximately four hours after learning that QuikTrip would not agree to reschedule the Effective Date, MSCG had devised a strategy.  Beckwith testified at his deposition that he told Vincent that "[a]t that point[,] the book transfer would need to have been broken and followed with some sort of physical transaction because [the parties] could not agree [on a new effective date]."  At 2:03 PM CST (1:03 PM MST), Vincent sent the following e-mail to Neely at Trafigura:

> As proposed below [referring to the Beckwith E-mail which Vincent was forwarding], we cannot agree to the book and have it due on [July 21].  We proposed earlier today to have the date changed to [July 24], however not all parties involved have agreed to this change.
>
> Due to this development, we will deem the book to be invalid and in turn, give you our batch in exchange for a valid origin. . . .  Please provide an origin for this ASAP.

(Emphasis added.)

Vincent's e-mail, which was sent after at least one of the parties in the Book Transfer Chain had already wired payment to its counterparty, was the first time that MSCG indicated to Trafigura that it considered the book transfer to be "invalid" and requested physical delivery of the gasoline.  Because Neely was out of the office on a two-day trip to New York, she did not immediately receive Vincent's e-mail.  Vincent sent a similar e-mail to Sawyer at SemFuel around 2:30 PM CST (1:30 PM MST) and

requested that SemFuel provide a batch on which to ship physical barrels of gasoline.  SemFuel did not respond.  Vincent did not notify the other parties in the Book Transfer Chain, namely Glencore and QuikTrip, that MSCG considered the book transfer to be "invalid" or was now attempting to arrange physical delivery of the gasoline.

Around 3:20 PM CST (2:20 PM MST), still unaware that QuikTrip had refused to reschedule the Effective Date and that MSCG had "deemed" the book transfer "invalid," Glencore's Davidson sent an IM to Vincent to confirm the rescheduling of the Effective Date to July 24.  Vincent informed Davidson that "because [QuikTrip] did not agree, [MSCG] deem[ed] the book [transfer] to be no good and it is now physical."  (Emphasis added.)  Vincent told Davidson that he had therefore "passed my batch to be filled."  Davidson replied sarcastically:  "um . . . ok."  Vincent responded, "gotta love it," to which Davidson retorted, "not really."  Davidson told Vincent that "this sucks bad" and asked whether Vincent had advised Trafigura of the change since he "had no idea that [the book transfer] changed."  Vincent told Davidson that he had informed Neely, but that he had received "no response."  Davidson told Vincent that Neely was out of the office.

After his IM exchange with Vincent, at 3:25 PM CST (2:25 PM MST), Davidson sent an IM to Coté, who was covering for Neely at

Trafigura.  Davidson asked Coté:  "did you know that the [Book Transfer Chain] changed to a batch?"  Coté opened up Neely's spreadsheet where she kept track of Trafigura's positions, and told Davidson that Neely had "it down as a book."  Davidson asked whether Trafigura had paid Glencore.  Coté replied that "its [sic] set up to be paid today" but that he would "double check."  Approximately five minutes later, Coté wrote to Davidson:  "Being told its not being paid . . . .  We cant [sic] pay you [Glencore] as we don't have anyone paying us."  Davidson replied:  "understood . . . working on it on my other end." Davidson testified at his deposition that, after his IM exchange with Coté, he was "not sure if this book was going to stick at the end of the day, [or] if it was going to change to physical. At that point we just didn't know."

7.   July 22-24, 2008:  Trafigura's Attempts to Accommodate MSCG

On Tuesday, July 22, the day after the Effective Date of the Book Transfer Chain, SemFuel and its parent company, SemGroup, filed for Chapter 11 bankruptcy.  That morning, Glencore's Davidson exchanged IMs with Deffenbaugh, the QuikTrip scheduler, who confirmed to Davidson that QuikTrip considered the book transfer to have been valid.

That afternoon, Vincent sent an IM to Coté, who was still covering for Neely, regarding the batch that he had e-mailed to

Neely the previous day.  At 2:56 PM CST (1:56 PM MST), Vincent represented to Coté that the book transfer was "no longer valid" and that the batch "needs to be passed down the chain."  Being unfamiliar with the transaction, Coté replied:  "Ok I will pass on to [Glencore]."  At 3:03 PM CST (2:03 PM MST), Coté sent an IM to Davidson at Glencore stating:  "The book is not [sic] longer valid.  I do have a batch though."  Coté provided MSCG's batch to Davidson.

In addition to trying to get an origin for its batch from "down the chain," MSCG explored other options for closing out its book transfer with SemFuel.  During an internal conference call on July 22, MSCG traders suggested that the "simplest method to close out [the book transfer] was to contact [QuikTrip] who was on the other side of [SemFuel] and agree to a book-out price."  Such an agreement between MSCG and QuikTrip would short-circuit the original Book Transfer Chain by eliminating SemFuel.  Although one of MSCG's traders reached out to QuikTrip to propose this solution, QuikTrip had already wired its payment to SemFuel, and indicated on July 23 that it was not willing to enter into the proposed arrangement.

On the morning of July 23, Vincent sent an IM to Coté to inquire about the status of the batch.  Coté informed Vincent that he had passed the batch to Davidson at Glencore, but had not received a response.  Vincent told Coté that the issue was

"at a point of urgency as the cycle is going to close soon."
Coté attempted to contact Davidson via IM and telephone, but
still received no response.  Later that morning, Vincent
contacted Neely, who had returned to the office, to inquire
about the batch.  Neely attempted to contact Davidson via IM,
but received no response.  At no time did Trafigura attempt to
procure a physical delivery of gasoline for MSCG other than by
passing the batch to Glencore.  And, during his IM exchanges
with Neely and Coté, Vincent never suggested that Trafigura's
traders should obtain gasoline from any source other than
Glencore.

On the morning of July 24, Vincent again contacted Neely
via IM to inquire about the status of the batch.  Neely told
Vincent that she and Coté had tried to reach Davidson at
Glencore, but that he had not responded.  Vincent speculated
(correctly it turns out) that Davidson's failure to respond was
due to the fact that "[Glencore] already paid whomever
[Glencore] owed" in the Book Transfer Chain (i.e., QuikTrip).
At 10:53 AM CST (9:53 AM MST), Coté again tried to contact
Davidson:  "We need an origin on that batch . . . .  This is
getting URGENT."  At 11:06 AM CST (10:06 AM MST), Davidson
finally responded, stating:  "I have been advised to instruct
you to speak to your CFO Mary Ellen Yakura . . . on this matter,
sorry for the delay."  When Coté inquired further, Davidson

28

replied:  "Matt, unfortunately I am not at liberty to comment on this matter any further, sorry."

At 2:33 PM CST (1:33 PM MST) on July 24, Vincent sent an IM to Neely inquiring about the status of the batch.  Vincent wrote:  "Urgent!!!  [W]e have [h]alf an [h]our to get an origin in for[] our . . . batch . . . .  [A]fter 4 pm EST, [Colonial Pipeline] will not accept it."  Neely responded:  "[W]e are checking on it.  I just spoke to another one of my traders who is going to call [G]lencore's trader.  I have no clue what the problem is."  Vincent replied: "[O]k, thanks," to which Neely responded, "[You're] welcome.  sorry about the mess."  Vincent wrote back:  "not your fault."  (Emphasis added.)  At 3:08 PM CST (2:08 PM MST), Vincent sent an IM to Neely stating that "we are passed [sic] the deadline."  Trafigura did not provide MSCG with an origin for its batch in time for gasoline to be physically delivered via the Colonial Pipeline on cycle 41.

8.  Aftermath

Although MSCG and Trafigura endeavored to reach a commercial resolution following SemFuel's bankruptcy, they were unable to do so.  On July 29, Trafigura was notified that its bank had paid Glencore $3,402,000 pursuant to the letter of credit that it had posted as security.  Trafigura also learned for the first time on July 29 that it had, in fact, been paid by

MSCG on July 21.  It was not until August 1, however, that MSCG
learned that it had wired its payment of $3,362,625 to
Trafigura.  MSCG demanded that Trafigura return its payment;
Trafigura refused.  On February 26, 2009, MSCG filed a proof of
claim in the SemFuel bankruptcy to recover the payment that
SemFuel failed to make on July 21, 2008 pursuant to the Book
Transfer Chain.


CONCLUSIONS OF LAW

MSCG brings a single claim against Trafigura for breach of
contract.  The parties do not dispute that, as provided in the
Contract, New York law applies to this action.  To establish a
prima facie case for breach of contract under New York law, a
plaintiff must prove: "(1) the existence of an agreement, (2)
adequate performance of the contract by the plaintiff, (3)
breach of contract by the defendant, and (4) damages." Eternity
Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375
F.3d 168, 177 (2d Cir. 2004); see also Clearmont Property, LLC
v. Eisner, 872 N.Y.S.2d 725, 728 (3d Dep't 2009).

MSCG contends that Trafigura breached the Contract when it
failed to physically deliver 25,000 barrels of M2 grade gasoline
to MSCG.  MSCG claims that it is therefore entitled to the
return of $3,362,625 it accidentally wired to Trafigura on July
21, 2008.

The Contract provides that Trafigura could deliver the gasoline to MSCG in either of two ways: (1) "via mutually agreeable scheduling during July 2008, on cycle 41," or (2) "via mutually acceptable book, stock or inventory transfer."  It is undisputed that on July 15, the Scheduling Day, MSCG and Trafigura mutually agreed that delivery would be made through the five-party Book Transfer Chain on the Effective Date of July 21.  This agreement was memorialized in the invoice sent by Trafigura to MSCG on July 17, which set forth the Book Transfer Chain sequence and instructed MSCG to wire its payment to Trafigura on July 21.

MSCG has not shown that Trafigura breached its agreement to deliver the gasoline via book transfer.  Pursuant to the Contract, and in accordance with industry custom and practice, title to the 25,000 barrels of M2 grade gasoline was deemed to have transferred from Trafigura to MSCG as of 12:01 AM on July 21, the Effective Date.  At that point, as documented in the parties' invoices, Trafigura was obligated to pay $3,402,000 to Glencore and was entitled to receive $3,362,625 from MSCG.  The fact that Trafigura placed a hold on its payment to Glencore is irrelevant because Trafigura had previously posted a standby letter of credit that satisfied its obligation to Glencore.  Accordingly, unless MSCG can demonstrate that Trafigura and MSCG agreed to amend the Contract prior to the Effective Date, its

breach of contract claim must fail.

MSCG contends that Trafigura agreed on the evening of July
18 that the book transfer would not proceed on July 21 when
Neely said the word "okay."[9]  According to MSCG, Neely's "okay"
was sufficient to provide Trafigura's consent to effectively
cancel the book transfer.  When the parties were thereafter

---

[9] MSCG also argued in its pretrial memorandum that industry
custom and practice permits a party to unilaterally cancel a
book transfer and select physical delivery instead.  By the end
of trial, MSCG had abandoned this argument and conceded that its
breach of contract claim rests solely on its argument that
Trafigura agreed to cancel the book transfer on July 18.

While it is unnecessary to reach this issue, it should be
noted that MSCG failed to demonstrate the existence of an
industry custom or practice that permits a party to unilaterally
cancel an agreed-upon book transfer on the effective date
without the consent of all the parties in the book transfer
chain.  MSCG could not point to a single example where a book
transfer chain was broken on the effective date without the
consent of all the parties.  Indeed, MSCG's sole expert witness
conceded that in order to cancel a book transfer chain on the
effective date, "it really takes the agreement of all parties."
(Emphasis added.)

The testimony of other witnesses experienced in the
industry was not to the contrary.  For instance, Morgan, who
oversees QuikTrip's scheduling and trading operations and has
approximately 23 years of experience, testified that industry
practice permits a party to unilaterally cancel a book transfer
only if it gives its contractual counterparties "timely notice."
Even then, however, "in special circumstances where a [book
transfer] chain is at risk and it's nearing the date of the
chain," all the parties in the chain must be notified.

Accordingly, Morgan opined that he would not have
considered the Beckwith E-mail on the evening of July 18 to have
constituted "timely notice" of MSCG's intent to unilaterally
cancel the book transfer.  A fortiori, Vincent's e-mail on the
afternoon of July 21 did not constitute timely notice under
industry standards that MSCG had "deemed" the book transfer
"invalid."  Indeed, it was Morgan's opinion that "nobody [in the
Book Transfer Chain] had the right to notify others on Monday
that that book needed to be rescheduled or broken."

unable to agree on a new effective date, Trafigura was required

to physically deliver the gasoline, both under industry custom

and because any other rule would make the Contract an

unenforceable agreement to agree.  MSCG's argument is without

merit.

MSCG has not shown that in uttering the single word "okay"

on the evening of Friday, July 18, Neely agreed on behalf of

Trafigura that the book transfer would not proceed on July 21.

To begin with, all that MSCG accomplished on July 18 was to

notify Trafigura that MSCG wanted its cooperation the following

Monday in attempting to reschedule the Effective Date of the

book transfer.  It is undisputed that rescheduling the Effective

Date would require the agreement of every member of the Book

Transfer Chain.  It necessarily follows that without this

consent, the Effective Date would remain July 21.[10]  Moreover,

given that MSCG's request came so close to the Effective Date,

and since title to the gasoline would be deemed to transfer at

12:01 AM on July 21, such consent could implicate only the

---

[10] MSCG argues that Trafigura had a duty to forward the Beckwith
E-mail to Glencore on Friday evening.  The Beckwith E-mail,
however, was not sent until 5:54 CST, well after the close of
business at both Neely's office in Texas and on the east coast
where Davidson, Glencore's scheduler, was located.  Moreover,
the Beckwith E-mail omitted Glencore from its list of
participants in the Book Transfer Chain.  In any event, whether
the Beckwith E-mail was forwarded or not has no effect on the
issue of Trafigura's purported breach of its contract with MSCG.

payment date for each of the contractual obligations in the Book
Transfer Chain, not the date of title transfer itself.

Furthermore, Neely's "okay" on Friday evening cannot
reasonably be said to imply anything more than Trafigura's
willingness to discuss the matter on Monday morning.  After all,
Burdic did not even propose a new effective date to Neely.
Without a concrete date, there was little to which Neely could
reasonably be said to have given her consent.[11]  It was not
surprising, of course, that MSCG had not yet decided on a new
effective date.  Events were unfolding quickly, the weekend was
fast approaching, and it was not even clear that MSCG would need
to pursue rescheduling once July 21 arrived.  Indeed, if SemFuel
posted security or made payment on July 21, it was MSCG's intent
to abandon its efforts to reschedule the Effective Date.

MSCG's entire argument rests on its assertion that Burdic
used the word "hold" in his unrecorded Friday evening telephone
conversation with Neely.  Tellingly, the word "hold" does not
appear in the instant message Burdic sent to Coté at Trafigura
that afternoon, in which Burdic stated that "[MSCG] need[ed] to
push back the agreed settlement date" for the book transfer.

---

[11] Even if Burdic had identified a new effective date for the
book transfer in his telephone conversation with Neely, her
"okay" could not reasonably have been understood to signify
anything other than an agreement that was conditional on the
acceptance of the proposal by all of the other parties in the
Book Transfer Chain on Monday.

(Emphasis added.)  Nor does that word appear in the Beckwith E-mail, which memorialized Burdic's and Beckwith's telephone conversations with Trafigura's Neely and SemFuel's Sawyer, respectively.  The Beckwith E-mail stated only that "[MSCG] cannot agree with the <u>effective date</u> of this [book] transfer. We will contact you, Monday morning, [July 21, 2008], to <u>reschedule</u> this transaction."  (Emphasis added.)[12]  Several witnesses, including Burdic, testified that they did not know what the term "hold" meant in connection with the scheduling of the effective date for a book transfer.[13]

Whatever its meaning, there is no support whatsoever for inferring that the term "hold," if Burdic did actually use that word, should have been understood as a reference to canceling the book transfer.  Grzeczka and Ownby, the two experts offered by the parties, both testified that a party must use unequivocal language such as "<u>cancel</u> the book transfer" or "<u>break</u> the book" if they intend to convey within the petroleum market that they

---

[12] Similarly, Burdic testified that he told Neely over the telephone that MSCG wanted to place "a hold" on the book transfer only "<u>until Monday</u>" when it would "reschedule" the book transfer.

[13] In fact, Vincent admitted at his deposition that "putting a book transfer on hold . . . means that we are <u>not</u> canceling the book."  (Emphasis added.)  Further, both Vincent and Beckwith testified that in most, if not all, instances in which they have been involved, when a book transfer has been placed "on hold," the book transfer has ultimately been consummated on the original effective date.

wish to cancel a book transfer.  Likewise, Morgan, who oversees
QuikTrip's scheduling and trading operations, testified that a
party must make a statement similar in effect to "this book is
broken" in order to provide unequivocal notice of its intent to
cancel.  And, of course, neither Burdic nor Beckwith sought in
their Friday communications with Trafigura any consent to a
cancellation of the book transfer.[14]  There has been no
suggestion that it was MSCG's intent as of Friday evening to
cancel the book transfer.  Indeed, if the book transfer
proceeded and SemFuel paid MSCG, MSCG stood to earn
approximately $80,000 on the transaction.[15]

Despite decades of experience in the market for petroleum
products, the witnesses in this trial recall no transaction like
this one.  In fact, they could not point to any instance in
which a multi-party book transfer chain that was agreed upon on
or before scheduling day was subsequently cancelled without the
consent of all the parties in the chain.  Once a book transfer
chain is formed, the obligations that two parties have
undertaken pursuant to their bilateral contract necessarily

---

[14] In fact, the draft version of the Beckwith E-mail explicitly
stated that "[MSCG] is committed to fulfilling its obligation
and will do so on Monday."  (Emphasis added).

[15] Hogan, MSCG's corporate representative, testified that MSCG
did not even discuss canceling the book transfer or having the
parties satisfy their obligations by physical delivery on July
18.

implicate the obligations that they have undertaken with their respective counterparties in the chain, and thus the obligations that all parties have assumed within the chain.  As such, any request to modify the book transfer chain will usually require notice to all parties in the chain, and one party's consent to any change will usually be contingent on the consent of all parties in the chain.  Thus, had MSCG wished to cancel the book transfer so close to the Effective Date on the evening of July 18, it undoubtedly would have contacted all of the parties in the Book Transfer Chain and communicated its intent in unequivocal terms.

By contrast, MSCG's own actions on July 21 demonstrate that it did not believe the Book Transfer Chain had been broken, or that its agreement with Trafigura to deliver gasoline via book transfer had been amended.  MSCG's actions also underscore its understanding that Trafigura's willingness to reschedule the Effective Date would be contingent upon the consent of all the other parties in the Book Transfer Chain.  On Monday morning, Vincent reached out to all the parties in the chain to propose a new effective date.  When QuickTrip refused to reschedule, its scheduler twice told Vincent that the Effective Date would remain July 21.  If Vincent believed that the book transfer had been cancelled on Friday, or was now cancelled because there was

no agreement on a new Effective Date, then one would expect that Vincent would have so notified QuickTrip's scheduler promptly.

Instead, it took hours of internal discussions for MSCG to devise its response.  It was not until Vincent's e-mail to Neely around 2:00 PM CST -- approximately four hours after MSCG learned that QuikTrip would not agree to reschedule the Effective Date -- that MSCG decided to "deem" the book to be invalid and pass a batch to Trafigura.  Moreover, the fact that MSCG believed it necessary to send an e-mail to Trafigura to "deem the book transfer to be invalid" further supports the conclusion that on July 18 MSCG did not ask, and Trafigura did not agree, that the book transfer would be cancelled in the event that the other parties in the chain failed to agree on a new effective date.

Finally, MSCG argues that the conduct of Trafigura's schedulers between July 18 and July 24 is evidence of Trafigura's agreement on July 18 to cancel the book transfer in the event the other parities in the Book Transfer Chain could not agree on a new effective date.  MSCG contends that Trafigura held its payment to Glencore and "passed the batch" down the chain during those days because Trafigura believed that it was obligated to physically deliver gasoline to satisfy the Contract.  To the contrary, Trafigura's conduct was consistent

with its understanding that the book had not been broken on July 18.

First, Trafigura's placement of a hold on its payment to Glencore is consistent with Trafigura's understanding that the parties were going to attempt to reschedule the Effective Date of the book transfer on July 21.  If the Effective Date of the book transfer were postponed, as MSCG had requested, then it would not be necessary for Trafigura to pay Glencore on July 21. In any event, Trafigura knew that Glencore would be able to draw down on its standby letter of credit, and thus that its contractual obligations to Glencore would be satisfied.

Similarly, Trafigura's schedulers' efforts to obtain an origin from Glencore between July 21 and July 24 do not evidence either Trafigura's understanding the book transfer had been cancelled, or an understanding by either MSCG or Trafigura that Trafigura now had a duty to physically deliver gasoline to MSCG. To the contrary, Trafigura's schedulers simply did their best to assist MSCG as it tried to salvage its position in the transaction.  For example, Vincent's IM on July 22 to Coté, who was Neely's backup scheduler and unfamiliar with the transaction, stated only that the batch needed to be "passed down the chain."  MSCG's request was meaningless unless the

chain was still intact.[16]  Doing nothing more than "passing the
batch" is also inconsistent with MSCG's argument at trial that
Trafigura had a duty to go into the market and procure gasoline
for MSCG.[17]

      At its core, this action represents an attempt by MSCG to
shift the burden of the credit risk to which it was exposed when
SemFuel's financial condition deteriorated in July 2008.
Unsatisfied by the prospect of seeking recovery in SemFuel's
bankruptcy proceedings, MSCG essentially asks that Trafigura be
placed in its shoes as the party that paid, but did not get
paid, in the Book Transfer Chain.  Such a result would not only
be unjust, but is completely unwarranted by the facts in this
case.  Because SemFuel was required to pay MSCG in the Book
Transfer Chain, MSCG was the party with the incentive and
opportunity to protect itself from the risks posed by SemFuel's
mounting financial difficulties.  MSCG failed to protect itself
adequately, however, by requiring SemFuel to post security

---

[16] Further evidence that MSCG understood that the Book Transfer
Chain still existed can be found in MSCG's efforts to reach
agreement with QuikTrip on July 22 and 23 to try to short-
circuit the Book Transfer Chain by eliminating SemFuel.

[17] If Trafigura had agreed to physically deliver the gasoline, it
would have been obligated to pay twice on the same contract.
Pursuant to its obligations under its contracts within the Book
Transfer Chain, it had already guaranteed payment of $3,402,000
to Glencore through the issuance of the letter of credit.
Procuring physical gasoline for MSCG other than by passing the
batch down the chain in search of an origin would have required
Trafigura to expend another multi-million dollar sum.

earlier, although it could have readily done so.  It was also in
MSCG's interest to devise a response to SemFuel's credit crunch
and to put all the parties in the Book Transfer Chain promptly
on notice of that response.  It did not do so.  The consequences
of MSCG's failures cannot now, in all fairness, be shifted to
Trafigura.

### CONCLUSION

Following a bench trial on July 7-9, 2010, MSCG's breach of
contract claim is denied.  Trafigura's motion in limine to
exclude evidence of MSCG's attorneys' fees is denied as moot.
The Clerk of Court shall enter judgment for Trafigura and close
the case.

SO ORDERED:

Dated:    New York, New York
          June 15, 2010

                                    _____
                                    DENISE COTE
                                    United States District Judge

41